FILED

MAY 2 8 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N F O R M A T I O N** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. **1 :26 CR 0 0 2 6 0** |
| | ) | Title 18, United States Code, |
| MIKESHA WILSON, | ) | Sections 1343 and 2 |
| | ) | |
| Defendant. | ) | **JUDGE POLSTER** |

GENERAL ALLEGATIONS

At all times relevant to this Information, unless otherwise specified:

Defendant and Relevant Entities

1.      Defendant MIKESHA WILSON was a resident of Euclid, Ohio, and Cleveland Heights, Ohio, in the Northern District of Ohio.

2.      Bank 1 was a federally insured financial institution headquartered in North Carolina.  Bank 1 had branch offices and automated teller machines ("ATMs") located in the Northern District of Ohio.

3.      Bank 2 was a federally insured financial institution headquartered in Minneapolis, Minnesota.  Bank 2 had branch offices and automated teller machines ("ATMs") located in the Northern District of Ohio.

4.      On December 19, 2023, the Consumer Financial Protection Bureau ("CFPB") issued an order against Bank 2 in connection with Bank 2's administration of prepaid unemployment insurance debit cards, specifically regarding Bank 2's freezing of certain prepaid debit cards due to suspected fraud.  As a result of the CFPB order, Bank 2 notified cardholders

whose cards had been frozen during the relevant time period that they could submit a redress claim and provide documents to show they incurred expenses during the time they were not able to access funds.

### Unemployment Insurance Background

5. The Social Security Act of 1935 initiated the federal and state unemployment insurance ("UI") system. The UI system provided temporary financial assistance to eligible lawful workers who were unemployed through no fault of their own. The purpose of the UI system was twofold: to lessen the effects of unemployment through direct cash payments to laid-off workers; and to ensure that life necessities were met weekly while the worker sought employment.

6. State unemployment systems and benefits were joint federal and state enterprises administered by the State Workforce Agency ("SWA") of a given state and largely financed by taxes on private employers located in the state. SWAs administered UI programs in accordance with federal laws and regulations. Each state set its own additional requirements for eligibility, benefit amounts, and length of time benefits were paid. Generally, UI weekly benefit amounts were based on a percentage of a lawful worker's earnings over a base period. When state unemployment benefits were exhausted, the U.S. Department of Labor ("DOL") could supplement them with federal funds.

7. In California, the SWA was the Economic Development Department; in Ohio, the SWA was the Department of Job and Family Services; in Tennessee, the SWA was the Department of Labor; in Pennsylvania, the SWA was the Department of Labor and Industry; and in Massachusetts, the SWA was the Department of Career Services (collectively, the "State SWAs"). Other states administered their UI programs through analogous state-run agencies. Regardless of the state, DOL funded each SWA's administrative costs surrounding UI.

2

8. Because of the COVID-19 pandemic, legislation expanded the State SWAs' ability to provide UI benefits. On or about March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act into law. The CARES Act expanded the SWAs' ability to provide UI for many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits. The CARES Act provided for new programs, including Pandemic Unemployment Assistance and other programs ("Pandemic UI").

9. To obtain Pandemic UI, an individual could apply online through the State SWAs' respective websites. Applications for Pandemic UI submitted to the State SWAs were routed to servers located outside the State of Ohio. Claimants answered various questions to establish their eligibility, including whether they had performed work in the state in which they were claiming Pandemic UI benefits. Claimants were required to provide personal identifying information, which included their name, mailing address, gender, email, phone number, social security number, and date of birth (collectively, "personal identification information"). Moreover, claimants had to identify a qualifying occupational status and COVID-19-related reason for being unemployed. Claimants could also submit several documents as evidence of their income.

10. Regardless of which of the federally funded Pandemic UI programs was involved, funds were distributed to program participants by the State's respective SWA, after the SWA received the funds from the United States Department of the Treasury. While there were different paths that payments could take from the Treasury Department to a Pandemic UI claimant, all such payments were routed through multiple states and across state lines in interstate commerce.

3

11.     The State SWAs specifically asked Pandemic UI claimants if they were receiving UI benefits from other states on their applications.  Claimants were prohibited from collecting UI benefits from more than one state at the same time.

12.     The State SWAs used designated banks, including Bank 1 and Bank 2 (collectively, the "Partner Banks"), to administer Pandemic UI benefits.  If a State SWA approved a claimant's application, the claimant could choose either to have the funds directly deposited into an existing bank account or to have the Partner Bank mail a debit card to the claimant at the mailing address identified by the claimant on their application or otherwise provided to the Partner Bank.  If the debit card option was chosen, the Partner Bank thereafter loaded funds on the claimant's card at certain intervals.

COUNT 1
(Wire Fraud, 18 U.S.C. §§ 1343 and 2)

The United States Attorney charges:

13.     The factual allegations contained in paragraphs 1 through 12 of this Information are re-alleged and incorporated as though fully set forth herein.

The Scheme to Defraud

14.     From in or around June 2020 through on or about April 8, 2025, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MIKESHA WILSON and others known and unknown to the United States Attorney, knowingly devised, and intended to devise, a scheme and artifice to defraud the United States Department of Labor, SWAs, and the Partner Banks to obtain Pandemic UI benefits, money, and property from United States Department of Labor and SWAs by means of false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

4

<u>Manner and Means of the Scheme</u>

15.     It was part of the scheme that:

a.     Defendant and others knowingly submitted and caused to be submitted Pandemic UI benefits applications to multiple SWAs, including the State SWAs, in the names of purported applicants, using the personal identifying information of the purported applicants, and making and causing to be made materially false statements and omissions on the applications to induce each SWA to approve the applications and issue Pandemic UI benefits, including false statements regarding personal identifying information, employment history, residency, and other information, and misrepresentations about who was receiving the benefits sought and whether the purported applicant was also receiving UI benefits from another state's SWA.

b.     Defendant and others, through the materially false statements and omissions on the Pandemic UI benefits applications, induced DOL and SWAs to issue Pandemic UI benefits to which they were not entitled, including in the form of Partner Bank-issued debit cards in the names of the claimants (collectively, the Fraudulent Debit Cards).

c.     Upon receiving the Fraudulent Debit Cards from the Partner Banks, Defendant used the Fraudulent Debit Cards to make purchases, transfers, and cash withdrawals at multiple locations in the Northern District of Ohio and elsewhere, thereby obtaining Pandemic UI benefits she was not qualified or authorized to receive.

d.     After spending or withdrawing the funds on certain Fraudulent Debit Cards, Defendant disputed the charges with the Partner Banks, inducing the Partner Banks to credit the accounts with additional Pandemic UI benefits to which Defendant was not entitled, which Defendant subsequently withdrew, transferred, or spent.

e.     Defendant later made additional false claims to the Partner Banks that she had suffered substantial financial harms from the temporary unavailability of benefits on the

original Fraudulent Debit Cards, despite the fact that Defendant had not been eligible for the benefits in the first place and had caused the temporary unavailability of the funds herself when she falsely disputed the charges to replenish benefits she had already used.

## Acts in Furtherance of the Scheme

16.     The acts caused by Defendant in furtherance of the scheme, in the Northern District of Ohio, Eastern Division, and elsewhere, included, but were not limited to, the following:

### *SWA Applications*

17.     From on or about July 18, 2020, through on or about October 5, 2021, Defendant submitted and caused to be submitted to the State SWAs approximately 22 electronic applications for Pandemic UI benefits in both Defendant's and other individuals' names. The information on the applications concerning the individuals' employment and eligibility to receive Pandemic UI benefits from the State SWAs was false.

### *Victim 1 California Application*

18.     On or about July 18, 2020, Defendant caused the submission of an electronic application for Pandemic UI benefits in the name of Victim 1 to the California SWA. The application listed a California mailing address and Defendant's residential address in Euclid, Ohio. The information on the application concerning Victim 1's residence, employment, and income was false, along with misrepresentations about who was receiving the benefits sought. Victim 1 did not submit the application and did not reside at either address listed on the application.

19.     On or about July 22, 2020, the fraudulent application caused Bank 1 to send, via U.S. mail, a Fraudulent Debit Card in Victim 1's name to Defendant's address in Euclid, Ohio,

6

which was subsequently loaded with Pandemic UI benefits in the approximate amount of $18,600.

20. On or about August 2, 2020, Defendant caused the transfer of $5,000 from the Fraudulent Debit Card in Victim 1's name to a bank account in Defendant's name, thereby obtaining California Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

21. On or about August 8, 2020, Defendant withdrew $1,000 from a Bank 1 ATM located in Cleveland, Ohio, using the Fraudulent Debit Card in Victim 1's name, thereby obtaining California Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's SSN No. 1 Ohio Application*

22. On or about June 12, 2020, Defendant caused the submission of an electronic application for Pandemic UI benefits in Defendant's name to the Ohio SWA. The application listed a purported social security number ("SSN") for Defendant ("SSN No. 1"), which the Social Security Administration ("SSA") had not assigned to Defendant or anyone else. The application stated Defendant resided in Ohio and was self-employed as an owner and operator of a clothing store, and that she last worked as a sole proprietor on March 15, 2020.

23. From on or about July 23, 2020, through on or about October 5, 2021, Defendant's fraudulent SSN No. 1 claim caused the Ohio SWA to approve approximately $13,980 in Ohio Pandemic UI benefits for Defendant; the funds were directly deposited into Defendant's bank accounts. Defendant thus obtained Ohio Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

7

*Defendant's SSN No. 2 Ohio Application*

24. On or about June 13, 2020, Defendant caused the submission of a second electronic application for Pandemic UI benefits in Defendant's name to the Ohio SWA. This time, the application listed a purported SSN for Defendant ("SSN No. 2"), which belonged to an individual other than Defendant. The information on the application stated Defendant resided in Ohio and was self-employed as a hair stylist, and that she last worked as an independent contractor on March 15, 2020.

25. From on or about July 27, 2020, through on or about October 5, 2020, Defendant's fraudulent SSN No. 2 claim caused the Ohio SWA to approve approximately $13,980 in Ohio Pandemic UI benefits for Defendant; the funds were directly deposited into Defendant's bank accounts. Defendant thus obtained Ohio Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's California Application*

26. On or about June 29, 2020, Defendant caused the submission of an electronic application for Pandemic UI benefits in Defendant's name to the California SWA. The application listed Defendant's true SSN and listed a California residential address along with a mailing address in Cleveland Heights, Ohio, that was the address of Defendant's family member. The application stated Defendant resided in California and was self-employed with an annual income of $48,000.

27. On or about July 2, 2020, Defendant's fraudulent application caused Bank 1 to send a Fraudulent Debit Card in Defendant's name (the "California Card") to the mailing address in Cleveland Heights, Ohio, via U.S. mail. The California Card was subsequently loaded with Pandemic UI benefits in the approximate amount of $15,900.

8

28. On or about July 10, 2020, Defendant caused the transfer of $5,000 from the California Card to a bank account in Defendant's name.

29. On or about July 15, 2020, Defendant withdrew $1,000 from a Bank 1 ATM located in Cleveland, Ohio, using the California Card, thereby obtaining California Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

30. On or about September 11, 2020, Defendant disputed charges on the California Card with Bank 1, claiming that she had never received the California Card, despite knowing that she had caused the charges to be made and was not eligible to receive Pandemic UI from California.

31. On or about September 14, 2020, Defendant's dispute caused Bank 1 to resolve the disputed charges in Defendant's favor and credit approximately $11,892.00 back to the California Card's account.

32. From on or about September 15, 2020, to on or about September 17, 2020, Defendant withdrew, spent, and transferred approximately $11,900.00 of the additional funds on the California Card, thereby obtaining additional California Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's Tennessee Application*

33. On or about July 12, 2020, Defendant caused the submission of an electronic application for Pandemic UI benefits in Defendant's name to the Tennessee SWA. The application listed Defendant's true SSN and listed Defendant's mailing address in Euclid, Ohio. The application represented that Defendant had not claimed any unemployment insurance benefits in the past 12 months.

9

34.     From or about July 15, 2020, through on or about October 6, 2020, Defendant's fraudulent application caused the Tennessee SWA to approve Tennessee Pandemic UI benefits of approximately $12,360, which were directly deposited into Defendant's bank accounts. Defendant thus obtained Tennessee Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's Pennsylvania Application*

35.     On or about July 9, 2020, Defendant caused the submission of an electronic application for Pandemic UI benefits in Defendant's name to the Pennsylvania SWA. The application listed Defendant's true SSN and listed a Pennsylvania mailing address. The also application stated that Defendant worked for a Pennsylvania employer until March 15, 2020.

36.     On or about July 10, 2020, Defendant updated the address on her Pennsylvania Pandemic UI application to reflect Defendant's address in Euclid, Ohio.

37.     As a result of the application, on or about July 15, 2020, Defendant's fraudulent Pennsylvania Pandemic UI claim caused Bank 2 to send, via U.S. mail, to Defendant's address in Euclid, Ohio, a Fraudulent Debit Card ("the Pennsylvania Card") in Defendant's name. The Pennsylvania Card was then loaded with approximately $13,485 in Pennsylvania Pandemic UI benefits.

38.     Between on or about July 22, 2020, and July 28, 2020, Defendant made approximately $8,226.99 in purchases from luxury retailers in Beachwood, Ohio, and Las Vegas, Nevada, using the Pennsylvania Card.

39.     On or about September 14, 2020, after the balance of the Pennsylvania Card had reached zero, Defendant disputed all the charges made on the Pennsylvania Card with Bank 2, despite knowing that she had caused the charges to be made and was not eligible to receive

10

Pandemic UI from Pennsylvania. Bank 2 deactivated the Pennsylvania Card because of Defendant's claim of unauthorized use of the card.

40. On or about October 26, 2020, Defendant's dispute caused Bank 2 to resolve the disputed charges in Defendant's favor and credit $13,470 back to her account; however, Bank 2 did not immediately unfreeze the account. Bank 2 later sent Defendant a replacement Pennsylvania Card.

41. On or about December 1, 2020, Defendant electronically activated the replacement Pennsylvania Card.

42. Between on or about December 1, 2020, and December 20, 2020, Defendant withdrew, spent, and transferred approximately $13,469.08 of the fraudulently credited funds on the Pennsylvania Card, thereby obtaining additional Pennsylvania Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the benefits were obtained under false pretenses.

*Defendant's SSN No. 3 Massachusetts Application*

43. On or about August 17, 2021, Defendant caused the submission of an electronic application for Pandemic UI benefits in Defendant's name to the Massachusetts SWA. The application listed a purported SSN for Defendant ("SSN No. 3"), which the SSA had not assigned to Defendant or anyone else, and listed a mailing address in Massachusetts. Defendant attached falsified documents in support of her application, including purported Forms 1099 from 2019 and 2020 in Defendant's name and SSN No. 3, with a Massachusetts address; a phone bill in Defendant's name with a Massachusetts address; and a copy of a purported social security card in Defendant's name with SSN No. 3. Defendant also attached a selfie of Defendant holding her Ohio driver's license. No benefits were paid out on the Massachusetts application.

11

*Defendant's SSN No. 3 Ohio Application*

44.     On or about October 5, 2021, Defendant caused the submission of a third electronic application for Pandemic UI benefits in Defendant's name to the Ohio SWA. This application also listed SSN No. 3 as her purported SSN, and listed Defendant's mailing address in Euclid, Ohio. Defendant attached a birth certificate with Defendant's name and true date of birth to the application. There were no benefits paid out on Defendant's third Ohio application.

*USPS Money Orders*

45.     On or about July 9, 2020, Defendant caused the purchase of two $1,000 United States Postal Service ("USPS") money orders using a fraudulently obtained California debit card:

a.     On or about August 11, 2020, Defendant caused one of the money orders to be deposited into an account controlled by Julian Ferguson (charged separately).

b.     Or about August 20, 2020, Defendant deposited one of the money orders into her own bank account.

46.     On or about July 11, 2020, Defendant caused the purchase of two USPS $1,000 money orders using the California Card in her name, which Kenneth Ferguson (charged separately) later deposited into a bank account he controlled.

*Defendant's Submission of Falsified Documents to Bank 2*

47.     On or about July 1, 2024, Bank 2 mailed a letter to Defendant advising her of her eligibility for Bank 2's settlement with the CFPB for any financial harm associated with Bank 2's deactivation of Defendant's Pennsylvania Card in 2020. Bank 2 enclosed a check for approximately $101.65 and instructed Defendant that if that payment did not fully compensate her for the financial injury she experienced because the Pennsylvania Card had been frozen, she could submit a claim for additional compensation.

12

48. On or about April 2, 2025, Defendant electronically submitted two claims for redress to Bank 2 via their claims website, alleging that Bank 2's freezing of the Pennsylvania Card prevented her from making the following payments:

a. A claim for $8,367 for an eviction between September 7, 2020, and October 14, 2020; and

b. A claim for $12,273.77 for an automobile repossession on September 17, 2020.

49. On or about April 8, 2025, Defendant submitted fraudulent documents to Bank 2 in further support of her redress claim:

a. The first page of a complaint, a Writ of Restitution, and a Final Appealable Order Notice from a Cleveland Municipal Court eviction case in which Defendant was a defendant. The eviction case in question had actually occurred in 2022, but Defendant had altered the dates and case number on the documents to make it appear that the eviction case occurred in 2020.

b. A screenshot of an email from a debt collector offering to settle a debt related to Defendant's 2013 Chevrolet Cruze. Defendant had altered the date on the email to make it appear that it was sent on September 20, 2020.

<u>Execution of the Scheme</u>

50. On or about August 17, 2021, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant MIKESHA WILSON, for the purpose of executing the foregoing scheme and artifice to defraud, and attempting to do so, knowingly caused to be transmitted the following writings, signs, signals, pictures, and sounds by means of wire communications in interstate commerce, to wit: an application for Massachusetts Pandemic UI benefits for which she was not eligible and to which she was not entitled, knowing the application for benefits was

13

made under false pretenses, causing an interstate wire communication from the Northern District of Ohio across state lines.

All in violation of Title 18, United States Code, Sections 1343 and 2.

DAVID M. TOEPFER
United States Attorney

By:    _____

Elliot Morrison
Chief, White Collar Crimes Unit

14